Filed 10/28/20  In re A.E. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re A.E., a Person Coming Under the Juvenile Court Law. | B302359 (Los Angeles County Super. Ct. Nos. 19CCJP03544, 19CCJP03544A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. A.E., Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Brett Bianco, Judge.  Affirmed.

Mitchell Keiter, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, David Michael Miller, Deputy County Counsel, for Plaintiff and Respondent.

Appellant A.E. (father) challenges the juvenile court's exercise of jurisdiction over his teenage daughter, A.E.  He contends there was insufficient evidence that A.E. was subject to a current risk of harm, and the juvenile court erred by failing to assess whether his striking of A.E. was reasonable discipline.  We affirm.

## BACKGROUND

*Allegations and Initial Investigation*

A.E. came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) on or about April 1, 2019, when she disclosed to staff at a psychiatric hospital physical abuse by father and sexual abuse by paternal grandfather.  DCFS children's social worker (CSW) Lopez was assigned to investigate the allegations.

CSW Lopez visited 16-year-old A.E. at the hospital on April 5, 2019.  A.E. told Lopez that she had been admitted to the hospital because she "wanted to cut her veins."  A.E. had been cutting herself superficially since she was 13 but had not received mental health services despite disclosing the self-harm to father, with whom she had lived.

A.E. told CSW Lopez that mother and father divorced when she was four. For the next four years, A.E. and her siblings, older sister S.E. and younger brother M.E., lived with paternal grandparents in Nevada.  Paternal grandfather sexually abused

2

A.E. during that time. A.E. and her siblings went to live with father in Texas when A.E. was eight.

Father married stepmother, and they had three younger children together. A.E. reported that stepmother treated her poorly by making her care for her younger step-siblings and "do chores continuously." Father disciplined A.E. by striking her with a belt.

A.E. came to live with mother in Los Angeles in early 2019 despite having had no contact with her since the divorce. A.E. reported feeling safe and supported with mother and mother's live-in boyfriend. A.E. further reported that she was able to talk to mother about her feelings and mental health; she had not been able to discuss such topics with father.

CSW Lopez visited mother's home on April 8, 2019. Mother reported that A.E. came to Los Angeles on a bus after father told her to leave his home. Mother reported that father had done the same thing with A.E.'s older sister, S.E., several years earlier.

Mother said A.E. first told her about the sexual abuse in March 2019; mother had not had any contact with her children when they lived with paternal grandparents or father. After A.E. disclosed the abuse, now-adult S.E. told mother that paternal grandfather also abused her. Mother did not have further information about the extent or frequency of the abuse. Mother also did not know the frequency or extent of father's alleged striking of A.E. A.E. told mother that her school had recommended she receive counseling services, but father and stepmother had not taken the recommendation seriously despite knowing about A.E.'s self-harm. Mother reported that she had called father "on numerous occasions" since A.E.'s arrival to discuss A.E.'s mental health, but father never returned her calls.

3

CSW Lopez spoke to A.E.'s adult sister S.E. on April 17, 2019. S.E. told Lopez she left father's Texas home years earlier because she felt father did not care for her or her siblings. S.E. further reported that father lacked patience with S.E., A.E., and M.E. and physically disciplined all three of them. S.E. recalled being struck by a belt and having her hair pulled and face slapped. S.E. did not know if father ever left marks on A.E. or M.E.

S.E. told CSW Lopez that paternal grandfather sexually abused her and A.E. by giving them candy and then placing his hand under their dresses. Neither S.E. nor A.E. told anyone about the abuse until A.E. disclosed it to mother after arriving in Los Angeles. According to S.E., mother notified father of the abuse but he did not believe the allegations; he stated "they were all lies made up by child [A.E.] and mother . . . to make paternal side of the family look bad."

CSW Lopez spoke to father by phone on April 29, 2019, after making at least four attempts to reach him. Father confirmed that the telephone number CSW repeatedly used was correct, but "police officers had advised him not to pick up calls from CSW Lopez or [mother] regarding [A.E.]." Father told Lopez he "sent child [A.E. to Los Angeles] as a way to discipline her for running away" from his home for approximately one month in November 2018. He bought A.E. a one-way Greyhound bus ticket on January 12, 2019 and sent her to Los Angeles alone, with her birth certificate, social security card, and high school identification card in case she "was questioned or stopped by police."

Father told Lopez that he wanted A.E. to return to Texas. He stated both that he and mother had agreed that A.E. would

stay in Los Angeles for up to a month and then return to Texas, and that he "expected" mother to send A.E. back "but did not discuss with mother [ ] that was the pl[a]n." Father had not had any contact with A.E. since placing her on the bus; he was not aware she had threatened suicide or been admitted to a psychiatric hospital. Father denied that A.E.'s school had recommended she receive mental health services and "added that he was unaware that A.E. was self-harming (cutting) while she was in his care."

Father denied striking A.E. and S.E. He told Lopez that he disciplined A.E. by confiscating her electronics or grounding her. Father also stated that A.E. never disclosed any sexual abuse to him. He characterized her allegations as "lies," and asserted that mother encouraged A.E.to lie to harm the paternal side of the family.

CSW Lopez spoke to A.E.'s younger brother, M.E., by phone on April 29, 2019. M.E. stated that father never physically disciplined him, and he did not ever see father physically discipline A.E. or S.E. M.E. also stated that he had never been sexually abused. M.E. felt safe in father's home. Lopez asked Texas law enforcement to conduct a welfare check on M.E.; they reported no concerns. The Texas Department of Family and Protective Services declined to generate a referral based on A.E.'s allegations.

CSW Lopez and nurse Johnson visited A.E. on May 1, 2019. A.E. told them she had been suicidal because father told her he did not want to deal with her anymore and she did not have anyone to talk to. A.E. said she was now able to talk to mother and her therapist and did not have a current suicide plan.

5

Johnson observed "patterned vertical cuts" on A.E.'s inner left arm; A.E. confirmed she had cut herself in the past.

*Detention and Petition*

DCFS detained A.E. from father on May 31, 2019 and placed her in mother's home. On June 4, 2019, DCFS filed a petition seeking to declare A.E. a dependent under Welfare and Institutions Code section 300.[1] The petition included six counts under subdivisions (a), (b), and (j). Counts a-1 and b-2 alleged that father physically abused A.E. on prior occasions by striking her with a belt, and that the physical abuse placed A.E. at risk of harm. Counts a-2, b-3, and j-1 alleged that father physically abused S.E. by slapping her face, pulling her hair, and striking her with a belt in or about 2011 and on prior occasions, and that such abuse placed A.E. at risk of harm. Count b-1 alleged that A.E. "has mental and emotional problems, including self-mutilating behaviors, and suicidal ideation, and the child's father . . . failed to obtain necessary counseling services for the child. Such medical neglect of the child by the child's father endangers the child's physical health and safety and places the child at risk of serious physical harm, damage, and danger." DCFS later amended the petition to add count b-4, alleging that father failed to provide A.E. "with the basic necessities of life " when he sent her to mother's alone without a plan for her ongoing care. The court dismissed count b-4 at the adjudication hearing, and it is not relevant to the instant appeal.

The juvenile court held a detention hearing on June 5, 2019. Father did not appear. The court found a prima facie case for detaining A.E. and ordered her released to mother's home. It

---

[1]All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

6

ordered "appropriate referrals" for services for mother and monitored visitation for father. The court set father's arraignment for July 1, 2019 and the adjudication hearing for July 29, 2019. Father did not appear for the July 1, 2019 arraignment.

*Jurisdiction/Disposition Report*

DCFS filed a jurisdiction/disposition report on July 1, 2019. The report documented more recent interviews DCFS conducted with A.E., S.E., and mother; father "has not made himself available to DCFS , therefore, statements on father's behalf have not been obtained."

On June 25, 2019, A.E. told dependency investigator (DI) Lopez that father and stepmother were both aware of her cutting and told her she was "just doing it for attention and that it wasn't going to work." A.E. further stated that father "doesn't treat me the same as my other siblings." "When, supposedly, I behaved bad he would hit me with a belt anywhere it landed. If I was talking back to my stepmom about not wanting to clean or help her. It was all the time. On my back and my legs and my arms. He would be telling me not to be doing stuff but since he gets mad really fast he would just get frustrated and he would just end up slapping me. He would always say, 'Call the police,' he said he wouldn't get in trouble." A.E. did not know if father ever struck S.E., but stated that he did strike her younger stepsiblings "with a belt on their butt." A.E. said that father sent her to Los Angeles "because I was too much of a problem for him." A.E. had not talked to father since leaving Texas.

DI Lopez contacted S.E. by telephone. S.E. confirmed that father struck her and A.E. with his hand and belt "mostly when he thought we misbehaved." S.E. said that A.E. and mother told

7

her that A.E. "was supposed to come to my mom's house because she left the house and that my dad couldn't deal with her anymore." Father told S.E. to "stay out of it" when she asked him about it, and also rebuffed her efforts to talk to him about paternal grandfather's sexual abuse: "he didn't want to talk to us, he didn't want to know anything about it. He denied it."

On June 25, 2019, mother told DI Lopez that A.E. had told her she did not feel like part of father and stepmother's family. Father "never paid her any attention" and "told her that she was crazy" when she tried to tell them she needed mental health services. Mother said that father and stepmother "don't believe in therapists, psychologists," and that stepmother "spoke badly of my daughter" the last time mother talked to her. A.E. told mother that father and stepmother always told her that she was "too outspoken," like mother, and father hit her with his belt and hand when stepmother complained about her.

Mother stated that S.E. "was also fed up with how her father treated her" and had told CSW Lopez that father hit her. Mother stated that she had agreed to give father custody during the divorce because she "was not stable and had no stable home" at the time. Father changed his phone number immediately after the divorce and mother did not know how to reach him or get in contact with the children.

Mother showed DI Lopez a Greyhound bus ticket dated January 13, 2019 for travel from El Paso, Texas, to Los Angeles, California. Mother told Lopez that father had not had any contact with A.E. since her arrival in Los Angeles. Mother had communicated with father, but only via text message. Mother stated that she and A.E. were getting along well and had not had any recent problems. She also stated that A.E. "has said she

8

would kill herself if she went back" to Texas, so mother was "doing everything that they've asked me to do to ensure she's well."

Two days after mother's interview, mother contacted DI Lopez to report that she and A.E. "had engaged in a verbal dispute in which the minor [A.E.] exhibited aggressive and disrespectful behavior." Mother asked Lopez to contact A.E. to "address her behavior and the consequences that may follow should she remain disrespectful and uncooperative in the home." Mother expressed frustration with A.E.'s attitude and lack of compliance with her responsibilities.

Lopez contacted A.E., who "did not sound upset or concerned by the incident reported by mother." A.E. "stated that she is still content in the care of the mother" and did not think the incident was a big deal. Lopez recommended Wraparound services to mother and A.E., and reported that both were receptive to receiving services.

DI Lopez recommended that A.E. remain in mother's care, with "conjoint/family therapy to address the current case issues." She further recommended that A.E. remain detained from father, "[g]iven all the information provided as to father and his parenting capabilities." She noted that father had "not maintained contact with DCFS despite his knowledge as to minor [A.E.]'s detention and DCFS and court involvement," and had not had any contact or visitation with A.E. DCFS recommended that the petition be sustained, that father receive reunification services, and mother receive family maintenance services.

*Last Minute Informations*

The court continued the adjudication hearing from July 29, 2019 to August 29, 2019. On the continued date, DCFS filed a

9

last minute information (LMI) reporting that it had received a letter from father.  In the letter, father stated that he would not be able to attend the proceedings due to the distance and his work schedule.

The LMI also reported that CSW Manzo spoke with father by phone on July 31, 2019. During that conversation, father stated, "They are all lies, I never hit her, she's making it up, she didn't want to follow the rules here, we are a Christian family, we go to church, everything the Court is saying are all lies. [A.E.] went to visit her mom on vacation, she was not doing well in school, she was giving me problems, she dyslexic [*sic*] and I tried to get help from her. [A.E.] is upset because she got into a fight with her sister [S.E.].  If she wants to come back she can come back any time.  I didn't do anything to her."  When Manzo asked why father had provided A.E. with all her important paperwork when he put her on the bus, he said it was in case of emergency. He then said, "I am at work right now; I can't be bothered with this" and ended the phone call.  The LMI reported that "Father has not maintained contact with DCFS since."

After the court continued the hearing to September 12, 2019 to allow an attorney to contact father, DCFS filed a second LMI.  It reported that DI Lopez spoke to father about the amended petition on September 11, 2019. During that conversation, father again denied that A.E. engaged in self-harm while she lived in Texas.  He said "if that was true, the doctors would have reported it" when he took her for checkups.  Father also denied that A.E.'s school ever contacted him about her mental health.  He said, "I think they made all that up over there, now. They're trying to make a big case out of it, a scandal." Father also denied striking A.E. and her siblings.  He stated that

10

"Whatever they have said is what [mother] used to do to them when they were small. That's why I took custody of them."

Father again reported that he had told mother he was sending A.E. to stay with her temporarily. "It was a visit but she never sent her back. It was understood that [A.E.] would come back. Why didn't she send her back to me? She's never been responsible for any of the children. Why does she want to keep her now? Why did she open a case on me?" Father explained that he did not communicate with mother about A.E. because mother "made threats against me. She said she was going to send someone here or make me disappear and I have a family to protect so I choose not to contact her. I made a police report asking for her [A.E.] to be sent back but the police said that they can't do anything about it since the mother has custody of her." Father did not recall when mother's threats occurred. He also stated that he did not contact A.E. directly because he did not have her phone number; he "cut the phone" A.E. had when she left Texas "because I figured why would I keep paying it if she's not going to come back."

Father stated he wanted A.E. to return to his care and said he would be "open" to participating in services if necessary. He reiterated, however, that "none of that was happening here. I don't know what happened over there, what show they put on there." He further requested that if A.E. did not return to Texas, that mother "needs to make sure she gets ahead in life and not expect me to be responsible, financially, or anything. She needs to be fully responsible, if not, then she needs to send her back."

*Adjudication Hearing*

The court held the adjudication hearing on September 12, 2019. It took judicial notice of the case file and admitted into

11

evidence the detention report, jurisdiction/disposition report, and LMIs. The matter proceeded by argument.

Counsel for DCFS asked the court to sustain the amended petition as pled. She argued that A.E. had been consistent in her allegations of physical abuse, mental health issues, and suicidal ideation. Counsel further argued that father demonstrated an inability to care for A.E. when he refused to address her mental health issues and instead sent her to live with mother. A.E.'s counsel also requested that the allegations be sustained. Mother's counsel submitted on adjudication because mother was non-offending.

Father's counsel argued that the amended petition should be dismissed. She stated that father acknowledged "some conflict going on in the home, . . . behavioral issues between a father and a daughter who is a teenager now." However, he "does dispute that he physically abused her with a belt," and also denied striking S.E. Father's counsel further argued that the allegations relating to the abuse of S.E. were "outdated" and "stale," and "there is nothing to show that there is any ongoing physical discipline of [S.E.]." Father's counsel disputed the truth of count b-1, which alleged that A.E. had mental and emotional problems and father failed to obtain counseling services for her. "[B]asically he says that that behavior was not happening when she was living with him, specifically the cutting." Father's counsel also disputed the b-4 allegation that father failed to provide for A.E.

The court dismissed the b-4 count alleging failure to provide but sustained all other counts as pled. The court immediately heard argument regarding disposition.

12

Counsel for DCFS advocated for an order placing A.E. in mother's home and providing family maintenance services for mother, individual counseling for A.E., and "enhancement services only" for father, in the form of a parenting program, individual counseling, and conjoint counseling with A.E. Mother's and A.E.'s counsel submitted on DCFS's proposed case plan. Father's counsel requested that the court terminate jurisdiction and award custody to mother. She explained, "His understanding is that the child does not want to return to him and so he's not going to to [*sic*] force her to return to him. We are dealing with a teenager. We do have a home of parent mother situation where if the child is not willing to share custody, it's not going to happen. So it is in his view that for him to do services at this point, even if willing, it would result in nothing since the child has made it very clear she doesn't want to return."

The court ordered A.E. detained from father and released to mother. It ordered father to participate in a parenting program and individual and conjoint counseling granted monitored visitation in the state of California. The court ordered mother to participate in conjoint counseling with A.E., and A.E. to enroll in individual counseling and school. The court set a progress hearing for October 21, 2019, and a six-month review hearing for March 12, 2020.

Father timely appealed.

**DISCUSSION**

I.    *The appeal is justiciable.*

Father makes two arguments on appeal. First, he contends that "[i]nsufficient evidence supported jurisdiction because there was no current risk" to A.E. at the time of the adjudication hearing, eight months after she left Texas. He asserts that

13

"[e]ven assuming he had engaged in unlawful physical punishment in the past, there was no current risk in September 2019, as Father was 1,500 miles away in [Texas], and neither [A.E.] nor Father had any interest in contacting the other." Second, father contends the "abuse finding" must be reversed because he has a right to reasonably discipline his child and the juvenile court failed to consider whether his striking of A.E. was reasonable discipline.

DCFS asserts that these arguments reach only the counts concerning physical abuse of A.E. and do not challenge the court's finding of jurisdiction on other bases: "father does not challenge jurisdiction based on his physical abuse of A.E.'s sibling or his failure to obtain services to address A.E.'s mental health issues." DCFS contends that the uncontested jurisdictional bases render the appeal nonjusticiable, and requests that we dismiss it. In reply, father contends that he "disputed the basis for any of the findings," because he asserted there was no current risk at all. "All the allegations asserted, and rested on, a current risk of harm to [A.E.]. Father disputed this current risk in the opening brief, and thus challenged all the jurisdictional findings."

"'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.) Thus, if a parent fails to challenge or concedes one or more of several jurisdictional

14

findings, jurisdiction is proper regardless of the validity of the parent's contentions on appeal. "As long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate." (*In re Ashley B.* (2011) 202 Cal.App.4th 968, 979.) No effective relief may be granted in such a case, rendering the appeal nonjusticiable. (*In re Madison S.* (2017) 15 Cal.App.5th 308, 329; accord, *In re I.A.* (2011) 201 Cal.App.4th 1484, 1490 ["An important requirement for justiciability is the availability of 'effective' relief—that is, the prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status."].)

Here, we agree with father that his argument regarding the absence of current risk, though succinct, reaches beyond the allegation that he physically abused A.E. The amended petition included three different allegations under section 300, subdivision (b): the first alleged that father physically abused A.E., the second alleged that father physically abused S.E., and the third alleged that father failed to obtain appropriate mental health care to address A.E.'s self-harm and suicidal ideation. All of these allegations required DCFS to prove "(1) one or more of the statutorily-specified omissions in providing care for the child . . .; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561.) In deciding whether the third element is satisfied, "courts evaluate the risk that is present at the time of the adjudication hearing." (*In re Roger S.* (2018) 31 Cal.App.5th 572, 582.) "'While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm.' [Citation.]" (*Ibid.*)

15

Father asserts that "[i]nsufficient evidence established a current risk *of any kind*," not merely physical abuse.  The appeal accordingly is justiciable.

II.     *There was sufficient evidence of current risk.*

We reject father's contention that there was insufficient evidence of current risk to A.E. due to his separation from her at the time of the adjudication hearing.

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them.  "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."  [Citation.]  "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.  [Citations.]."'"  (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

All three subdivisions under which the juvenile court sustained allegations permit the exercise of jurisdiction where there is a substantial risk of future harm.  (See § 300, subds. (a), (b), (j).)  As most relevant here, section 300, subdivision (b)(1) provides for jurisdiction where "[t]he child has suffered, *or there is a substantial risk that the child will suffer*, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . or by the willful or negligent failure of the parent or guardian to provide the child with adequate . . . medical treatment."  (§ 300, subd. (b)(1), emphasis added.)  Under the plain language of these

16

provisions, the juvenile court must reasonably believe the child faces substantial risk of harm in the future if returned to the parent, not that he or she faces harm at the exact moment of the hearing. Were the law interpreted as father suggests, the juvenile court would never be able to exercise jurisdiction over a child who was removed from parental custody at the time of the adjudication hearing. The relevant question is whether there is substantial evidence that the alleged harm will recur. The answer to that question here is yes.

The amended petition alleged that A.E. "has mental and emotional problems, including self-mutilating behaviors, and suicidal ideation, and the child's father . . . failed to obtain necessary counseling services for the child. Such medical neglect of the child by the child's father endangers the child's physical health and safety and places the child at risk of serious physical harm, damage, and danger." Substantial evidence demonstrated that A.E. struggled with ongoing serious mental health challenges. She experienced suicidal ideations, was admitted to an inpatient psychiatric facility, and had visible, "patterned" self-harm scars on her arm. Substantial evidence also showed that father denied or failed to acknowledge the existence of A.E.'s issues. He repeatedly denied that A.E. engaged in self-harm while in his care, and mother stated that father and stepmother "don't believe in therapists, psychologists." A parent's denial of wrongdoing or failure to recognize the negative impact of his or her conduct is relevant to determining risk under section 300. (*In re A.F.* (2016) 3 Cal.App.5th 283, 293.) The juvenile court reasonably could find it likely that A.E., who had threatened to kill herself if she had to return to Texas, would be at risk of

17

serious physical harm under the care of someone who did not recognize or seek help for her challenges.

Substantial evidence also supported the court's finding that A.E. was at risk of being physically harmed by father. Both A.E. and S.E. stated that father struck A.E. with a belt in the past. A.E. stated that father struck her "all the time," "[o]n my back and my legs and my arms," in response to misbehavior, out of frustration, and when stepmother complained about her. Father denied these allegations, but the juvenile court was permitted to credit A.E. and S.E.'s statements over father's. To the extent the striking had a disciplinary motivation, there was evidence that A.E. exhibited challenging or "disrespectful" behavior even in mother's care, and father acknowledged "some conflict going on in the home . . . behavioral issues between a father and a daughter who is a teenager now." The court reasonably could conclude that disputes would arise between A.E. and father, and that father would respond as he had in the past.

Father points to *In re J.N.* (2010) 181 Cal.App.4th 1010, in which the court held that a single episode of drunk driving did not present a current risk of serious physical harm to the children. *In re J.N.* is inapposite. The petition here alleged an ongoing pattern rather than "a single episode of endangering conduct." (*In re J.N.*, *supra*, 181 Cal.App.4th at p. 1025.) There was evidence that father struck A.E. over a period of several years, at least since S.E. had lived with the family, and that A.E. had engaged in self-harming behavior for at least three years without receiving mental health treatment. Moreover, *In re J.N.* held that the juvenile court "should consider the nature of the conduct and all surrounding circumstances" when evaluating the risk of current harm, including "evidence of the parent's current

18

understanding of and attitude toward the past conduct that endangered a child, or participation in educational programs, or other steps taken, by the parent to address the problematic conduct in the interim." (*Id.* at pp. 1025-1026.) The court here considered the relevant circumstances, including father's ongoing denial.

III. *We need not address father's alternative argument that "the abuse finding" must be reversed.*

Father contends "the abuse finding" must be reversed because the juvenile court failed to assess whether father's striking of A.E. was reasonable discipline. He argues that the court erred as a matter of law because it did not use the three-pronged test of disciplinary reasonableness set forth in *In re D.M.* (2015) 242 Cal.App.4th 634, 641: "(1) whether the parent's conduct is genuinely disciplinary; (2) whether the punishment is 'necess[ary]' (that is, whether the discipline was 'warranted by the circumstances'); and (3) 'whether the amount of punishment was reasonable or excessive.'"

As we explained above, sufficient evidence supported the court's exercise of jurisdiction on count b-2, concerning A.E.'s mental health issues and father's failure to address them. "As long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate." (*In re Ashley B.* (2011) 202 Cal.App.4th 968, 979.) We accordingly need not and do not address father's further challenge to the court's jurisdictional findings.

19

# DISPOSITION

The juvenile court's jurisdiction finding is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


MANELLA, P. J.


CURREY, J.